Next case is Torretti v. Main Line Hospitals. Ms. Axelrod, good morning. Good morning, Your Honor. The first issue that this court... You would like some rebuttal time? Yes, I'm sorry. I'd like to reserve three minutes for rebuttal, please. All right. I think I should begin by addressing the supplemental issue on which this court requested briefing... Very good. ...which concerns the threshold for EMTALA coverage. And that appears to talk about emergency rooms, does it not? It talks about emergency departments, sir, not just emergency rooms. But at Paoli that day, Ms. Torretti was not in an emergency department, was she? Emergency department is defined under the statute to include the entire main hospital campus, not merely an emergency room. In fact, it even includes the parking lot and the driveway. There is an exclusion for things that are not part of the hospital, such as a private physician's office. Mrs. Torretti did not go to a private physician's office. She went to a perinatal center operated by the hospital and staffed by the hospital's employees, so that she went to an emergency department of the hospital within the meaning of the statute. I'm not sure I agree with you, but assuming you are correct, you have to show actual knowledge that they knew that there was an emergency circumstance here. Emergency existed, and they did not stabilize Ms. Torretti prior to her going to Lincoln L. What evidence do you have that there was actual knowledge on their part? Remember, this particular statute was put into place because people were basically told to leave emergency rooms who needed emergency treatment because they were indigent and could not pay for that treatment. This is an entirely different situation than what Congress was attempting to address. I respectfully disagree, Your Honor. You're addressing subsection A, which does concern the general populace. However, Congress was also very specifically concerned with the rights of pregnant women who are having contractions. You're absolutely correct, but the point is that they have to know that it's an emergency situation and not stabilize the person. What's in the record here? So, for example, when she went to Lincoln L., and the one person just stopped by the room where the testing was taking place, and I think the person may have dropped, the doctor may have dropped his or her cup of coffee and went, I mean, look out. Was that test, did it show the exact same thing at Paoli? No, it did not. It was even worse by the time she got to Lincoln L., but I would like to address your question, if I may, about what was required in order to invoke EMTALA. EMTALA says that if a pregnant woman is having contractions, she's in an emergency per se. If a transfer to another hospital may pose a threat to either the woman or the baby, she does not have to presently be about to expire. There does not have to be an immediate emergency condition that requires heart monitors, as long as it may pose a threat. In this instance, you had a woman who was having contractions one-and-a-half to two-and-a-half minutes apart. She was clearly having contractions. They were going crazy on the monitor. She was grunting and yelling in the room. In addition, the regulations say that it's presumed that it's true labor for purposes of EMTALA, as long as there's not an express certification by the doctor that she's in false labor. There was no express certification by Dr. Gerson that Mrs. Charetti was in false labor when she was at Paoli. Therefore, not only was she having contractions, she was in true labor for purposes of the statute. Was she a patient as the regulation defines it? Yes, sir. May I finish? Oh, I'm sorry. I thought you had. I'm sorry. And I'd love to get to that question. The issue, again, with respect to her condition and what they knew and whether it may pose a threat, the undisputed medical testimony or evidence, excuse me, from the plaintiff's experts was that there were serious threats. This baby was in risk of sudden decompensation and death. What this doctor did was to take a baby who had not moved in two days, who had a very abnormal heart study with no fluctuations. I think what she said, not that the baby hadn't moved, that the movement had diminished over the course of the two days. No, she said that on Saturday when she got to the office on Monday. She said this baby has not moved in two days, and that's what the records show, no movement in two days. Do you want to point that out in the record where that was said? I'm sorry, sir. It is in the doctor's hospital. It's in the chart in the doctor's records and cited in the brief. In addition, so that this baby was at risk. And what did they do? They took a woman who was having contractions, had a high-risk pregnancy, and they discharged her, not even to an ambulance. And these people said, we know somebody who's got an ambulance. Should we go with them? No. They discharged her into the care of her husband, who has no obstetrical training. The baby's taken off the monitor. The husband has no clue what's going on with this baby. The baby ends up needing an emergency cesarean section. This husband didn't know anything about, in the words of Prissy, birthing babies. He couldn't have done a normal birth. And it sounds like a great malpractice case. But in this case, for example, if she perceived and her husband perceived it was so much of an emergency, why did they stop home on the way from Paoli to Lincoln? Because the doctor didn't share with them what was going on. He never said, this baby has no normal breathing sounds. This baby has an abnormally flat heart rate. He was just real reassuring, and they thought everything was fine. Wasn't the biophysical profile 6 at Paoli? What the record shows, isn't it? Yeah, but it also shows a lot of abnormalities. And, in fact, from the defense perspective, Dr. Gerson and the defense experts never said this baby was not at risk. All they said is, in our estimation, we think she probably could have gotten to Lincoln Hall to deliver. Not that there are no risks. They never mentioned the risks. So the only discussion of risks came from the plaintiff's experts.  Let's focus on that for a second. The standard here is actual knowledge. And how do you prove actual knowledge? Is it entirely your expert? No, it's the circumstantial medical evidence known to the doctor. And the actual knowledge is that the transfer may pose a threat based on all the information known to the doctor. A woman who is diabetic, carrying hugely excessive amounts of fluid, baby hasn't moved in two days. I understand. And what would your expert testify? That a doctor in his position should have known that there was an emergency. He would testify that the woman is having contractions and that the doctor had to have known that this woman... No, wait. Okay. Let's focus on that. That the doctor should have known or had to have known. Well, he knew. He knew enough to know that this baby was at risk. I'm sorry. I used the wrong words. He knew. No, no, no. That the baby was at risk. No, the word is actual knowledge. But he only has to have actual knowledge that the transfer may pose a threat. So the question is, does he have actual knowledge of the threat? And yes, he did. How is that proved? It is proved by the medical evidence known to the doctor, which taken together shows that he knew that this baby was at risk, that there were threats of the baby's sudden decompensation and demise, as shown by the whole plethora of medical evidence in front of him. You don't need an admission of guilty knowledge from the doctor that, yeah, I knew it. And I wrote it down in the chart that this baby may suddenly die, and then I discharged the baby. Again, this is not a jury argument. Yes, sir. There are some very important legal questions here. And as I'm sure all of counsel know, this court has not previously had an MTALA case that has given rise to a presidential opinion. So there are some important legal points aside from the plethora of facts that you've recited here. And starting at first things, I would assume both sides would agree, as the questioning has suggested here, and as other circuits have held, that there is an actual knowledge standard here, right? Correct, sir. All right. So as Chief Judge Sirica has asked, then, how do you go about proving actual knowledge? And in this particular case, how do you go about proving actual knowledge, where you do not have what we would characterize as direct evidence, that is most classically a statement or admission that would suggest actual knowledge, so that I understand your position correctly, and because it seems to me there is a significant difference between should have known and would have known, which is effectively did know. You're right. I don't mean to argue a negligent standard, sir. Exactly. Should have known really is a negligent standard, is it not? Correct. So how do you go about demonstrating, in the absence of an explicit admission, through obviously expert testimony, that what Dr. Gerson actually knew here was that he had an emergency on his hands? Yes, sir. Not the facts of your case, but how does one actually, as a legal principle, demonstrate that evidentially? You demonstrate that he had actual knowledge of the threats posed by the transfer, which is all you need to show, that there was actual knowledge that the transfer could pose a threat. But you're going to need more than that, because those facts in a vacuum don't really mean anything. Don't you need to have some expert expression that these particular facts, known to someone who is a paranatologist, would necessarily suggest to him actual knowledge of an emergent condition? I would agree that they would have to suggest actual knowledge that the transfer may pose a threat, which is what the statute requires. And yes, the experts will testify that the medical information known to the doctor showed that he demonstrated the actual threats that a doctor knows exist, based on this evidence. You're seeking to overturn a ruling of summary judgment. And when I first read the district court's opinion, there was one sentence in that opinion that caught my attention. And it's at the top of page 20 of the opinion, which is 22A of the appendix. It follows the discussion of some of the other cases from other courts, from other circuits. Judge Sanchez writes, the cases which have survived motions for summary judgment involve a greater quantum of disputed facts than exist in the case before me. And I guess this may sound like a softball, and I'll be interested to hear what the other side has to say, but the suggestion of a greater quantum of disputed facts than exist in the case before me certainly suggests that there is or are some disputed facts in this particular case. And if so, what are they and what is the import of them? The defense has disputed whether the baby was in a present emergency condition at the time of the discharge. The defense has not disputed and has not presented any evidence that the baby would not have, that would have been under subsection A, that the baby was not subject to risks and threats by the transfer. In fact, the only evidence as to whether the transfer may pose a threat or risks came from the plaintiff's experts. So I would suggest with respect to that, that the defense has absolutely failed in its burden to show that there were no risks or threats and that the transfer did not, therefore did not pose, that there was not an actual emergency within the meaning of subsection B, dealing with pregnant women who were having contractions. I think the defense evidence actually failed on that score. But I would also like to address, if I may, your question about whether she was a patient. I think that if you look at the definition of patient, it refers to someone who has begun to receive outpatient services as part of an encounter. Had she not begun to receive outpatient services? Isn't that precisely what she was receiving? I think there are two answers. First, each encounter is viewed individually under the statute. The hospital has argued that no, as long as someone has any outpatient history with the hospital, they've begun to receive services. That essentially cuts some towel off at the knees. It means if Mrs. Turetti had gone to the hospital. No, no, we understand your point. Why don't you get to the next point? Okay. When she arrived, before she began to receive services, she reported that the baby had not moved in two days, and she was grunting and yelling with her contractions as soon as she sat down in the chair in the waiting room, before she began to receive services. The statute uses a prudent layperson standard and says if such a person would think that there may be an emergency at the time before the services are received, then this person has presented to the hospital with what may be an emergency condition and therefore meets the EMTALA threshold. The only way the defense has tried to argue around it is to say you go back to the first time that she ever sought services at the birthing center. But the statute doesn't talk about an encounter or a series of encounters or a course of treatment. It talks about an encounter, each of which is viewed individually. On this point, is there any distinction between the pregnant patient and the general patient? No. No, this simply has to do with the meaning of patient and encounter. I think that's also clear, by the way. If you look at the Federal Register 6853237, they talk about whether EMTALA applies depends not only on where you go, whether you go to what area of the hospital, whether it's to the hospital or outside of it, but, quote, on what type of request for examination or treatment is made. In other words, it's the encounter that day. And all the examples they give of people being outside the statute are, for example, I go to the hospital for my annual mammogram. They start to give me the mammogram. I feel chest pain and pain running down one arm. I may have started to show the signs of a heart attack. I may then be showing signs of an emergency condition, but I've already begun to receive services that day. And they were for a non-emergency thing, my annual mammogram. That's not this woman's circumstance. She was there grunting in labor and with a baby who hadn't moved in two days, something that anyone, the receptionist, they had to have known that this may be an emergency situation. Good. Any other questions? Thank you, Ms. Axelrod. Thank you. Mr. Hoffman. Good morning. May it please the Court, my name is Peter Hoffman, and I think I can keep my arguments relatively brief this morning. I do want to comment on some things that Ms. Axelrod said, and also in response to a question Your Honor, Judge Ambrose, I believe, asked, as to what was in the hospital record, which is attached, and I have it here. We're getting at 143 and 144. 144A. Decreased. Yeah, decreased. And that it hadn't stopped. And that's the extent of the record. In terms of an emergency, both Mrs. Charetti. What about her point that if someone is clearly in active labor having contractions, which at this point are not ten minutes apart, not six minutes apart, but only a minute and a half, that something you have to know that there's an emergent situation here? I don't believe so. Because the emergent situation, and I'd just like to point out, the first time that that provision and definition of emergent situation was argued by the Charettis was in the reply brief in this Court. And I'm prepared to deal with it if it was argued, no matter when it was. She came in to the perinatal testing center, which is not part of the hospital. It is not staffed by hospital employees. It's in an office in the medical building. It's run by Dr. Gerson and his group. But during the course of her being there, once she got there, she was in obvious, great distress. She was in obvious discomfort with her contractions. She was hooked up to the monitor. She immediately began to receive services. She was hooked up to the ultrasound. Dr. Gerson believed at that point that the heart monitor showed a heart rate of 120, which is fine. There was a lack of beat-to-beat variability, which concerned him. But he said, I didn't want to keep her there that long because she needed prolonged testing. She needed to go to a place where she could be tested for some length of time, and this is not the place to do it. The ultrasound showed limb movement, body movement, and fluid. When there's no variability during this 28-minute test, what does that mean? It can mean anything, and Dr. Gerson explained it in his deposition. Babies have rest cycles. In fact, when she was taken down to Lankenau at noon and she was hooked up to the monitor, she had two accelerations, and accelerations are good and positive things in terms of what the physician is able to tell about the baby in utero. So the fact that there was no beat-to-beat variability in and of itself doesn't mean that we've got an emergent situation. It means that Dr. Gerson realized and spoke with Mrs. Turetti, spoke with Mr. Turetti, spoke with the doctor at Lankenau, Dr. McConnell, and said, I don't know if she's going to deliver today, but she may. It's not imminent, and I'd like to send her down there. This was not the first time this happened. Mrs. Turetti was a regular at this perinatal testing center. She went twice a week to be monitored for her diabetic condition, and she was. On two other occasions in April, she had actually been told by Dr. Gerson, you better get down to Lankenau because you may be in preterm labor. They thought this could have been it, and you have to be monitored. That's where your obstetricians are. That's where the folks who will deliver you are, and she was fine with that. She could have delivered at Paoli if the doctor perceived that the baby was coming right now. If Dr. Gerson thought that it required a stat caesarean section or whatever, she could not have been delivered in the prenatal testing center, but they would have called her over to the hospital, they would have gotten an obstetrician, and somebody would have come in and delivered the baby. And that would have taken just a matter of minutes. Half an hour, whatever. But in the half an hour that she went to Lankenau, in fact the 40 minutes, she was monitored at Lankenau for nearly a half an hour. And it wasn't until about 12, 30 minutes later that the baby's heart rate went down to 90, and that's when the coffee spilled. Now, your honor had asked, and I think it was Judge Smith, and if I'm wrong I apologize, who said that when reading Judge Sanchez's opinion, there was a sentence that stuck out. And that was... The greater quantum of disputed facts. Right. And what we've done is we went back and we read all those cases. That's what we're supposed to do. In the Burdett case, which plaintiffs cite as an example of a violation of the EMTALA, throughout the Burdett case, and the Burdett case is a horrible case, in three places, four places, it's clear that the hospital had conceded that there was an emergency medical condition. Because of the hypertension. Yes. And went through it in a number of places. The parties agreed that there was appropriate screening of Rivera and discovered she had an emergency medical condition. So that issue was already settled. But what's your position on how you prove actual knowledge? Are you saying that there has to be an admission in every one of these cases? In some of the cases, you prove it by what's in the records. In one of the cases, and I'm trying to remember which one it was, I think it may be Thomas v. Christ Hospital, there was a dispute between the nursing staff and the physician. And this is a violation of the hospital. It's normally not the physician's case. So when the people in the hospital disagreed with the physician, and also in the Burdett case, the nurse said, we've got an emergency situation here. You better get in, Dr. Burdett. And Dr. Burdett comes in and says, I'm not going to treat her. I don't want to have an increase. I treat who I want. I'm not treating her. It's classic dumping. And the nurses, going up to the nursing secretary. Also classic direct evidence. But we don't have that. Classic direct evidence. It's not here. All right. So as Chief Judge Sirica has asked, are you suggesting that what we need is some form of direct evidence? Surely you're not suggesting that. Direct evidence is best. Right, but we don't have that. Not here. So the liberal regime deals with proving state of mind all the time. We do it in the criminal law all the time. We do it by circumstantial evidence all the time. So why couldn't the plaintiff at least attempt to prove actual knowledge through, as here, Dr. Klein's expert testimony? Can it be done through an expert who says, no, while there's not an admission, these are the facts that prevailed and were obvious to the defendant doctor. Any defendant doctor within this area of specialization would have known. Isn't that a way of demonstrating actual knowledge under this statute? Would have known is as bad as should have known. Is it? Yes, it is, because it's standard of care. It's misdiagnosis. It's a malpractice case. This malpractice case still survives. Dependent state claims. Yes. Still. But in the cases I've read, in the Burdette case, in the Owens case, another horrible case, in Battle, in Babber, in Thomas, in all those cases what the courts look to, even where they discuss there's an expert, there's something more. Now, doctor, there's something more. That's exactly what got my attention when I read this language in the district court's opinion. I wondered, given the unusual nature of this statute, which I agree with you, this is not simple negligence. This is not garden variety negligence. There is a recognition certainly in the cases that state law must still prevail in the field of malpractice. This is not a surrogate for malpractice claims. It's something different. But in the absence of direct evidence, was there a suggestion here by the district court that there's some kind of higher threshold of proof that is required to demonstrate this action? I don't believe Judge Sanchez suggested that. Well, he certainly didn't say it, but I think what he did is he carefully read all the cases. That's obvious. And we argued, as careful as we could, all of the cases. And in all of the cases there was something else. There was either admission by the nurses or there was something in the record that was so obvious. Or there was someone who kept having seizures. There was something in the record here about there being, instead of a biophysical evidence of a rating of a six, it might have been a two. What was the reference to the numeral two? That's what Mrs. Toretti said she understood when she came off the ultrasound. This was not a formal biophysical profile. There was an ultrasound, which took less time, and they assessed the size of the baby. The baby was large for gestational age. Extremely. Yes. It would not be an understatement to say huge. A 34-weeks, 11-pound baby is off the charts. Correct. But that doesn't mean you deliver the baby at that point, necessarily. And that's why he wanted her to go to the best place for prolonged testing. I'm still not sure that I understand your argument as to why a competent expert can't testify that any competent doctor in this position should have known that this was an emergency. Tell me why that's impermissible. I think as I read the cases, the other circuits have said that standing alone is impermissible. That's not admissibility. That's just it doesn't prove it all by itself. It can't prove it all by itself. Then you have to look at Dr. Klein's. Tell me why. Look at Dr. Klein's. No, no. Tell me why an expert cannot so testify. Why doesn't it prove actual knowledge? Or could in certain circumstances. I don't know how an expert can say, I have actual knowledge of what Dr. Gerson actually knew. I don't think that there's a district judge in this district who would allow that testimony. What if he frames his expert testimony as my earlier question suggested? That a specialist in this field, that is a trained perinatologist, confronted by facts A, B, and C, would know or should have known. Why is that not permissible expert testimony? I think there has to be a basis for it. If you read Dr. Klein's, I don't think that he sets forth an adequate basis. And I think that what the other circuits have said. Let's assume that he has set forth the basis. We're trying to figure out what the legal standard is here and why this does not constitute actual knowledge. And as I understand it, your position is that you need some either direct or circumstantial evidence. That relates to the doctor who's making or the hospital personnel who are making that decision. Other than an expert report saying that they should have known. Now it seems to me your best argument, I don't know whether it's sufficient, is that to hold otherwise transforms this into a malpractice case. Correct. I don't know whether that carries the day or not, but it seems to be an accurate statement. And that's, as I read the cases from the other circuits, that's essentially what they're saying. In the case where there was this... Why couldn't you handle that by way of a limiting instruction by the trial judge? He simply indicates what the opinion testimony is admissible and probative of. But it's not to be considered for purposes of proof of the state med mal case. Mal causes of action. I just don't believe, in my experience and what experts are supposed to talk about, that that would be competent expert testimony. But there is another way. And Dr. Gerson was deposed. And the standard, if you read the deposition carefully, is very skilled trial counsel is deposing him in a medical malpractice case. And that was the scope of the definition. I believe that if the scope of the deposition had been working backwards from the definition in the EMTALA, then perhaps a skilled interrogator could have gotten that evidence, which would have established actual knowledge. Or you could have a situation where it's so obvious, where the child has seizures, comes into the emergency room, they let him go. But your opponent is saying it is so obvious because the woman was having contractions every minute and a half and was in severe distress. We have no burden in this issue. But we supplied experts, board-certified perinatologists, who took the other side. So to say that we didn't meet a burden, we had no burden to meet. But I understand. But what we're asking, Judge Rick's question is, you know, we've got to write an opinion here. What is the test that you want? What are the parameters for finding that something is actual knowledge? Obviously, it's not the empiricist school of Hume and Lord Barclay. It's something less than that. But it can't be the normative school either. We can't have experts. No, that's malpractice. So what is it? It's not hindsight. It's not hindsight. All right, good. We gave Ms. Axelrod a little time. Thank you very much. We'll give you a little more, too. She says that you're wrong on both the issue of whether she was a patient and also whether she was physically in an emergency room or department. Ms. Axelrod says that both the statute and the regs cover emergency department. And it doesn't have to be a specific emergency room. And also that she questions your definition of patient. Well, the definition of patient, let me just get my gear on that point, if I could. I don't believe she can be construed to be a patient. Comes to an emergency department with respect to an individual who is not a patient. Patient is defined as an individual who has begun to receive outpatient services as part of an encounter. Encounter is further defined as direct personal contact between a patient and a physician. She had a continuing encounter or series of encounters. And she came on Monday the 23rd of May to have a visit with Dr. Gerson in the perinatal testing center for which she was treated. Under the definitions of encounter and patient, she then is a patient. And I think it couldn't be more clear. And I think we pretty much discussed it satisfactorily in our brief. But it would seem that a woman who is pregnant might be in a different situation than someone who is not in that condition. The statute doesn't make any allowance in your view. No, what the statute does, and Ms. Axelrod pointed it out at great length, is the definition of emergency medical condition in the statute. There's a special definition of emergency medical condition for a woman who is pregnant and has contractions. And I don't believe that under either category she met that standard. What about the physical setting? Does it make a difference that she was in the prenatal section? I don't believe it's an emergency department. We haven't defended the case along that line. She's clearly not in the emergency department. But what we've taken, and the case has been defended rightly or wrongly from the beginning, that this was an Intala issue and the issue was actual knowledge and stabilization. We didn't study the regulations. We were asleep at the switch. Maybe we could have filed something previously. But that was the way the case has been defended. Any other questions? Good. Thank you very much, Mr. Ms. Axelrod? Yes, sir. Very briefly, I would like to answer your question about the knowledge, the information in the medical record. The letter from Dr. Gerson in the Appendix 145A states, The fetal heart rate is flat. Honey has not felt any movement for two days. But you look at 143 and 144. It says that on 143 it's a decreased annotation for fetal movement. And on 144 it says, Patient states decreased fetal movement in 48 hours. Spoke with Dr. McConnell Saturday regarding contractions. Did not feel activity was issue at that time. Did not call back regarding decreased activity. Decreased activity on Saturday. This appointment was on Monday. And two days later he's reporting in his letter to her obstetrician that she has not felt any movement for two days. But when she was first hooked up to the stress monitor at Paoli on Monday, was the heart rate about 120? Is that correct? I believe it was. And there was no variability, which can be a sign of. Correct, it can be. Hypoxia, brain damage, all kinds of things going on with this baby. And, in fact, the doctor deliberately cut the monitoring short before he could reach any definitive conclusion about whether this baby was. There were questions. There were warning signs, things that one needs to be concerned about. But does that mean that there necessarily is an emergency and that he knew that there was an emergency? Well, for purposes of the statute, I get back to if she's having contractions and the transfer may pose a threat, that becomes an emergency for purposes of the statute. And the undisputed evidence on that was that the transfer did indeed pose threats of sudden fetal death and that it was not without these threats or risks. But the drop from 120 to 90 occurred where, at Lankenau? That occurred later. Yes, it became worse and worse and worse. But it's clear that the transfer itself posed a threat, and that's what our doctors have said. And there's, in fact, no opposing testimony or report from the other side saying there were no threats, no risks. They just ignored the whole topic. But that's what EMTALA talks about, risks or threats. You can't ignore it. Is the malpractice claim still pending in what, state court is where it is now? It would be referred back to state court. If the case were transferred, yes, there would still be a malpractice claim. And I agree in certain ways. Perhaps the statute in Congress's desire to protect pregnant women steps into the malpractice area because it talks about may pose a threat. The statute itself incorporates a negligence standard, not a negligence standard, may pose a threat. In other words, that's all you have to prove, that there may be a threat. And that's not that there must be a present emergency and actual knowledge that this baby is about to expire this second, just that the transfer can pose a threat. That's the statutory standard. And I think as soon as you look at all the non-pregnant women cases, they're really irrelevant because they're not applying that standard. If you look at the cases applying that standard, you have women who later delivered perfectly healthy babies. Mother and baby were fine. But the courts looked at this and said, well, the transfer could pose a threat because the woman is in the care of someone who couldn't deliver the baby. If the baby suddenly came out, the baby could have cords wrapped around the throat. The baby could have fetal decompensation. There are all these threats that existed, and that made the situation an emergency, even if they were not presently happening. Any other questions? No. Ms. Axelrod, thank you very much. Thank you. The case was well argued. We'll take the case under advisement.